**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| DEBORAH BUCHER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>QUALDERM PARTNERS, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## **CLASS ACTION COMPLAINT**

Plaintiff Deborah Bucher ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), upon personal knowledge of facts pertaining to her and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant QualDerm Partners, LLC ("QualDerm" or "Defendant"), and alleges as follows:

## **NATURE OF THE ACTION**

1. This is a class action brought by Plaintiff Deborah Bucher, individually and on behalf of all others similarly situated, against Defendant QualDerm Partners, LLC for Defendant's failure to properly secure and safeguard the protected health information ("PHI") and personally identifiable information ("PII") (collectively, "Private Information") of hundreds of thousands, if not millions, of individuals, including Plaintiff and Class Members, who were patients of QualDerm or its affiliated dermatology practices.

2. QualDerm is a large dermatology management organization that partners with and operates dermatology and skin-care practices across numerous states. As a condition of providing healthcare services, QualDerm required patients to entrust it with highly sensitive Private

Information, including names, dates of birth, medical record numbers, medical conditions and histories, diagnosis information, treatment information, health insurance information, dates of service, treating physician names, email addresses, and, for certain individuals, driver's license numbers.

3. On or about December 23 and 24, 2025, an unauthorized actor accessed a limited number of QualDerm's systems and removed certain information stored within those systems (the "Data Breach"). QualDerm detected the unauthorized activity on December 24, 2025, and thereafter engaged a third-party cybersecurity forensics firm to investigate.

4. The forensic investigation confirmed that the unauthorized actor successfully exfiltrated Private Information from QualDerm's systems. The compromised data elements vary by individual but include: patient name; date of birth; doctor name; medical record number; email address; medical condition or history; treatment information; diagnosis information; health insurance information; treatment facility; date(s) of service; and, in some cases, date of death. For some individuals, driver's license numbers were also compromised.

5. According to QualDerm's report to the Texas Attorney General, published on February 24, 2026, 174,837 Texas residents were affected by the Data Breach. Defendant has begun providing notification to those affected via website posting, United States mail, email, and publication.

6. The Private Information compromised in the Data Breach is precisely the type of data that is highly coveted by cybercriminals and identity thieves. Medical data and PHI are among the most valuable categories of stolen data on the black market and dark web because, unlike credit card numbers that can be cancelled, medical identities, diagnoses, and treatment histories cannot be changed. Studies consistently show that compromised healthcare records sell for substantially

more than compromised financial records, and victims of medical identity theft face years of remediation.

7. The fact that an unauthorized actor removed the Private Information, as QualDerm itself has acknowledged, means that the data was not merely accessed or viewed but was affirmatively exfiltrated from QualDerm's systems. This exfiltration dramatically increases the risk that the data has been, or will be, sold, published, or used for identity theft, medical fraud, insurance fraud, phishing, social engineering, and other malicious purposes. Once removed from a healthcare provider's systems by an unauthorized actor, there is no mechanism to retrieve, recall, or "un-steal" the data.

8. Despite the highly sensitive nature of the Private Information it collected, maintained, and stored, and despite its obligations under federal and state law (including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH"), and applicable state data protection statutes) QualDerm failed to implement and maintain reasonable and adequate data security measures sufficient to protect Plaintiff's and Class Members' Private Information from the foreseeable risk of unauthorized access and exfiltration.

9. QualDerm further compounded Plaintiff's and Class Members' injuries by delaying notification of the Data Breach for over sixty (60) days after detection, depriving affected individuals of the opportunity to take prompt protective action during the critical period immediately following the Data Breach.

10. As a direct and proximate result of QualDerm's failures, Plaintiff and Class Members have suffered and will continue to suffer injuries, including but not limited to: (a) the unauthorized exfiltration and exposure of their Private Information; (b) loss of the benefit of the


Case 3:26-cv-00230 Document 1 Filed 02/27/26 Page 3 of 28 PageID #: 3

bargain and overpayment for services that did not include adequate data protection; (c) loss of the value of their privacy and confidentiality in their Private Information; (d) the present and continuing heightened risk of identity theft, medical identity fraud, insurance fraud, and other crimes, including increased spam emails; (e) time and money expended and to be expended mitigating the consequences of the Data Breach; (f) anxiety, emotional distress, and loss of privacy; and (g) diminution of the value of their Private Information.

11. Plaintiff brings this action to hold QualDerm accountable and to obtain damages, restitution, and injunctive and declaratory relief requiring QualDerm to implement and maintain reasonable data security practices, including encryption, multi-factor authentication, regular penetration testing, and appropriate access controls, and to provide adequate credit monitoring and identity theft protection services to Plaintiff and Class Members, among other relief.

## PARTIES

12. Plaintiff Deborah Bucher is, at all relevant times has been, a citizen and resident of Will County, Illinois.

13. Plaintiff was a patient of a QualDerm Partners-affiliated dermatology practice and, as a condition of receiving healthcare services, entrusted QualDerm and its affiliated practice with Plaintiff's Private Information, including but not limited to Plaintiff's name, date of birth, doctor name, medical record number, email address, medical condition or history, medical treatment information, diagnosis information, health insurance information, treatment facility, and date(s) of service.

14. Plaintiff received notice of the Data Breach via email on February 23, 2026. The notice informed Plaintiff that QualDerm had experienced a security incident and that Plaintiff's Private Information may have been compromised.

15. Defendant QualDerm Partners, LLC is a limited liability company with its headquarters and principal place of business at 5141 Virginia Way, Suite 350, Brentwood, Tennessee 37027. Defendant is a dermatology management organization that partners with dermatology practices across multiple states to provide healthcare services.

16. Defendant, together with its network of affiliated practices, collected, maintained, and stored the Private Information of its patients, including Plaintiff and Class Members, in connection with the provision of healthcare services. QualDerm was at all relevant times responsible for protecting the confidentiality, integrity, and security of the Private Information in its possession, custody, or control.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (a) the proposed Class consists of more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one Class Member is a citizen of a state different from Defendant. Specifically, Plaintiff is a citizen and resident of Illinois. Defendant QualDerm Partners, LLC is a limited liability company. Pursuant to 28 U.S.C. § 1332(d)(10), an unincorporated association — including a limited liability company — is deemed a citizen of the state under whose laws it is organized and the state where it maintains its principal place of business. Upon information and belief, QualDerm Partners, LLC was organized under the laws of Tennessee and maintains its principal place of business in Brentwood, Tennessee 37027. Accordingly, QualDerm is a citizen of Tennessee for CAFA purposes, and minimal diversity exists because Plaintiff is a citizen of Illinois. To the extent the Court looks beyond § 1332(d)(10), upon information and belief, Defendant's members are citizens of states other than Illinois, and minimal

diversity independently exists under 28 U.S.C. § 1332(d)(2)(A).

18. This Court has personal jurisdiction over QualDerm because QualDerm maintains its headquarters and principal place of business at 5141 Virginia Way, Suite 350, Brentwood, Tennessee 37027, which is within this District. QualDerm conducts substantial business in this District, and the claims arise from QualDerm's conduct directed at and emanating from this District.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because QualDerm resides in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including QualDerm's maintenance and storage of Plaintiff's and Class Members' Private Information at and through systems operated from this District.

20. Assignment to the Nashville Division of this District is proper under Local Rule 3.01 because Defendant's principal place of business is in Brentwood, Williamson County, Tennessee, which lies within the Nashville Division.

## FACTUAL ALLEGATIONS

### A. QualDerm's Collection and Storage of Private Information

21. QualDerm operates as a management services organization that partners with and manages dermatology and skin-care practices across the United States. Through this network of affiliated practices, QualDerm collects, stores, processes, and maintains vast amounts of sensitive Private Information belonging to millions of patients. On average, QualDerm's 350 providers treat over 120,000 patients every month.[1]

---

1 https://www.qualderm.com/#:~:text=What%20to%20Know%20About%20QualDerm,Learn%20more%20about%20us%20here. (last accessed, February 27, 2026).

22. When patients seek treatment at QualDerm-affiliated practices, they are required to provide extensive Private Information as a condition of receiving care. This information includes, but is not limited to, the patient's full name, date of birth, email address, medical record number, medical conditions and history, diagnosis information, treatment information, health insurance information, treating physician's name, treatment facility, date(s) of service, and government-issued identification information, such as a driver's license number.

23. By collecting this Private Information, QualDerm assumed legal and equitable obligations to Plaintiff and Class Members to protect, safeguard, and keep confidential their Private Information. These obligations arise under federal and state statutes and regulations, industry standards, and the reasonable expectations that patients place in their healthcare providers to maintain the security and confidentiality of sensitive medical and personal data.

24. Plaintiff and Class Members provided their Private Information to QualDerm with the reasonable understanding and expectation that QualDerm would comply with applicable laws, regulations, and industry standards to keep such information confidential and protected from unauthorized access. QualDerm received significant economic value from the receipt and use of Plaintiff's and Class Members' Private Information.

**B. The Data Breach**

25. On or about December 23 to 24, 2025, an unauthorized actor gained access to a limited number of QualDerm's computer systems and removed certain information stored within those systems.

26. QualDerm detected unauthorized activity on its systems on December 24, 2025. Upon detection, QualDerm states that it took steps to contain the incident and engaged a third-party cybersecurity forensics firm to investigate the nature and scope of the intrusion.

27. The forensic investigation determined that an unauthorized actor accessed QualDerm's systems during the incident window and affirmatively removed certain Private Information stored on those systems. This was not merely unauthorized viewing of data; it was active exfiltration—the unauthorized copying and removal of data from QualDerm's possession to a location controlled by the unauthorized actor.

28. According to QualDerm's report filed with the Texas Attorney General and published on February 24, 2026, the Data Breach affected a total of 174,837 Texas residents. The data elements potentially compromised for each individual vary but may include: (a) patient name; (b) date of birth; (c) doctor name; (d) medical record number; (e) email address; (f) medical condition and/or history; (g) treatment information; (h) diagnosis information; (i) health insurance information; (j) treatment facility; (k) date(s) of service; (l) date of death; and, for a very small number of individuals, (m) driver's license number.

29. QualDerm notified affected individuals through multiple channels, including website posting, United States mail, email, and publication. Plaintiff received notification by email on February 23, 2026—approximately two months after QualDerm detected the breach on December 24, 2025.

30. Upon information and belief, QualDerm has not disclosed the full nature and extent of its security failures that permitted the Data Breach, the specific vulnerabilities exploited by the unauthorized actor, whether the exfiltrated data has appeared on the dark web or been otherwise disseminated, whether QualDerm has been subject to any ransom demand in connection with the breach, or the total number of individuals affected, which is believed to be several million.

### C. The Value of PHI and the Harm Caused by Its Exfiltration

31. The healthcare industry is a prime target for cyberattacks because healthcare data

is among the most valuable data for cybercriminals. Medical records contain a rich combination of personal identifiers, insurance details, and clinical data that can be exploited for identity theft, fraudulent billing, insurance fraud, and targeted phishing campaigns.

32. Unlike financial data, which can be changed or cancelled, the categories of PHI compromised in this Data Breach—medical conditions, diagnoses, treatment histories, and health insurance information—are inherently immutable. A patient cannot change a past diagnosis or medical procedure. This immutability means that the harm from the exposure of PHI persists indefinitely, creating a lifelong risk of exploitation for each affected individual.

33. Medical identity theft is one of the most pernicious consequences of healthcare data breaches. When a criminal uses stolen PHI to obtain medical care under another person's identity, it can result in: (a) incorrect information being added to the victim's medical records, potentially leading to misdiagnosis or inappropriate treatment; (b) fraudulent insurance claims that exhaust the victim's benefits; (c) collection actions against the victim for medical debts they did not incur; and (d) years of effort to identify and correct the resulting errors.

34. The confirmed exfiltration of Private Information in this case, meaning data was not merely viewed but affirmatively removed from QualDerm's systems by an unauthorized actor, establishes that the data is now in the possession of a criminal third party. This substantially heightens the risk of misuse beyond a case of mere unauthorized access. The exfiltrated data contains precisely the elements necessary for identity theft, medical fraud, insurance fraud, and sophisticated phishing campaigns targeting affected individuals.

35. The combination of data elements compromised, which links patient names with dates of birth, medical conditions, diagnoses, treatment details, and insurance information, creates a comprehensive profile that cybercriminals can leverage for targeted attacks. For instance, a

criminal possessing a victim's diagnosis and treatment information can craft highly convincing phishing communications that reference specific medical details, dramatically increasing the likelihood that the victim will respond and disclose additional sensitive information.

36. The Private Information compromised in the Data Breach commands a significant price on underground criminal markets. Numerous sources report dark web pricing for stolen identity credentials: personal information sells for $40 to $200 per record, and bank or insurance details command $50 to $200. Stolen credit or debit card numbers sell for $5 to $110, while access to entire company data breaches is sold for $900 to $4,500.[2] Compared to credit card information, personally identifiable information and medical records are worth substantially more on the black market because they cannot be cancelled or reissued.[3]

37. Once Private Information is sold on the dark web, it is frequently used to gain access to various areas of the victim's digital life, including bank accounts, social media, insurance portals, and tax records. This can lead to additional Private Information being harvested from the victim, as well as from family members, friends, and colleagues of the original victim. The data compromised in the QualDerm Data Breach, which links patient names, dates of birth, medical diagnoses, and insurance details, is particularly valuable because it enables both financial fraud and medical identity fraud, and because the combination of data elements allows criminals to construct comprehensive identity profiles that are difficult for victims to detect and remediate.

---

[2] *See* Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, Digital Trends (Oct. 16, 2019), *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Feb. 27, 2026)

[3] *See* Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Network World (Feb. 6, 2015), *available at* https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Feb. 27, 2026).

**D. QualDerm's Inadequate Data Security Practices**

38. QualDerm was required by law and industry standards to implement and maintain reasonable data security measures to protect the Private Information in its possession. These obligations are established by, among other sources: (a) HIPAA and the HIPAA Privacy and Security Rules (45 C.F.R. Parts 160 and 164); (b) the HITECH Act (42 U.S.C. §§ 17921–17954); (c) Federal Trade Commission guidance and enforcement actions; (d) National Institute of Standards and Technology ("NIST") frameworks; and (e) industry best practices for cybersecurity in the healthcare sector.

39. The HIPAA Security Rule requires covered entities and their business associates to, among other things: (a) ensure the confidentiality, integrity, and availability of all electronic PHI they create, receive, maintain, or transmit; (b) identify and protect against reasonably anticipated threats to the security or integrity of electronic PHI; (c) protect against reasonably anticipated impermissible uses or disclosures; and (d) ensure compliance by their workforce. 45 C.F.R. § 164.306(a).

40. The HIPAA Security Rule further requires implementation of administrative safeguards (including risk assessments, workforce training, and access management), physical safeguards (including facility access controls and workstation security), and technical safeguards (including access controls, audit controls, integrity controls, and transmission security). 45 C.F.R. §§ 164.308, 164.310, 164.312.

41. The HITECH Act strengthened HIPAA's enforcement framework, extended certain HIPAA obligations directly to business associates, increased penalties for non-compliance, and imposed breach notification requirements. 42 U.S.C. §§ 17931–17940.

42. Upon information and belief, QualDerm failed to implement and maintain

reasonable and adequate security measures to protect Plaintiff's and Class Members' Private Information from unauthorized access and exfiltration. Specifically, and upon information and belief, QualDerm's failures include but are not limited to one or more of the following: failure to implement or enforce adequate access controls, including multi-factor authentication; failure to conduct regular and adequate risk assessments; failure to implement adequate intrusion detection and prevention systems; failure to adequately monitor its network for unauthorized access; failure to maintain adequate logging and auditing capabilities; failure to train employees on cybersecurity best practices; failure to patch known vulnerabilities in a timely manner; failure to properly monitor third-party data security systems for existing intrusions, brute-force attempts, and clearing of event logs; failure to ensure that employees and third-party vendors practice the principle of least-privilege and maintain credential hygiene; failure to avoid the use of domain-wide, admin-level service accounts; failure to ensure that employees and third-party vendors employ or enforce the use of strong, randomized, just-in-time local administrator passwords; failure to adequately oversee third-party vendors with access to Private Information; and/or failure to implement reasonable data retention and disposal policies. The specific security failures will be further detailed through discovery.

43. QualDerm knew or should have known of the risks inherent in collecting and storing large volumes of PHI and PII, and of the specific, foreseeable risk that failure to adequately secure such data would result in unauthorized access, exfiltration, and harm to the individuals whose data it held. Healthcare data breaches have been widely reported and are among the most common and damaging types of cybersecurity incidents. QualDerm was on notice that it was a target for cyberattacks by virtue of the volume and sensitivity of the healthcare data it maintained.

44. Federal and state governments have established security standards and issued

recommendations to minimize data breaches and the resulting harm to individuals and institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[4]

45. Among other things, FTC guidelines provide that businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[5] The FTC further recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

46. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect personally identifiable information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations. Upon information and belief,

---

[4] *See* Federal Trade Commission, *Start With Security* (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Feb. 27, 2026).

[5] *See Federal Trade Commission, Protecting Personal Information: A Guide for Business (rev. Oct. 2016), available at* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Feb. 27, 2026).

QualDerm failed to comply with the data security standards established by the FTC's guidance and enforcement actions.

**E. QualDerm's Delayed Notification**

47. QualDerm detected the unauthorized activity on December 24, 2025, but did not begin notifying affected individuals until on or about February 23, 2026—approximately two months later. Although QualDerm states that it engaged a forensics firm and conducted an investigation, the delay in notification deprived Plaintiff and Class Members of the ability to take timely protective measures during the critical period immediately following the breach.

48. Under the HITECH Act, covered entities are required to notify affected individuals of a breach of unsecured PHI without unreasonable delay and in no event later than 60 calendar days after discovery. 42 U.S.C. § 17932(a). Prompt notification is essential because the window immediately following a data breach is the period of greatest vulnerability for affected individuals, as cybercriminals typically move quickly to exploit stolen data.

49. During the approximately two-month delay between QualDerm's detection of the breach and its notification to affected individuals, Plaintiff and Class Members were unaware that their Private Information had been exfiltrated and were unable to take steps to protect themselves, including placing fraud alerts, monitoring accounts for suspicious activity, or enrolling in identity theft protection services.

50. Malicious actors frequently wait months or years before using Private Information obtained through data breaches, as victims become complacent and less diligent in monitoring their accounts after the initial period following a breach. These bad actors also reuse stolen Private Information, meaning affected individuals can be victims of multiple crimes stemming from a single breach. The 12-month single-bureau credit monitoring offered by QualDerm is wholly

inadequate to address these persistent risks, given that the exfiltrated data, particularly medical records, diagnoses, and treatment histories, cannot be changed and will remain exploitable indefinitely. Moreover, consumers are injured each time their data is traded on underground markets, even if they have been victims of previous data breaches, as the dark web comprises multiple discrete repositories of stolen information that can be aggregated or accessed by different criminal actors for various fraudulent purposes.

### F. Plaintiff's and Class Members' Injuries

51. As a direct and proximate result of the Data Breach and QualDerm's failures, Plaintiff and Class Members have suffered and will continue to suffer actual, concrete injuries, including but not limited to the following:

a) The unauthorized exfiltration and exposure of their Private Information to criminal third parties, which constitutes a concrete, de facto injury in and of itself;

b) A substantially heightened and imminent risk of identity theft, medical identity fraud, insurance fraud, phishing, and other criminal misuse of their Private Information, which risk is not speculative but is established by the confirmed exfiltration of data by an unauthorized actor;

c) Loss of the value of the privacy and confidentiality of their Private Information;

d) Actual out-of-pocket expenses and time spent monitoring financial accounts, credit reports, and health insurance statements for evidence of fraud or misuse;

e) Actual out-of-pocket expenses and time spent investigating the Data Breach, reviewing the breach notification, and taking responsive protective measures;

f) The cost of credit monitoring, identity theft protection, and other mitigation services;

g) Loss of the benefit of the bargain and overpayment for healthcare services that were implicitly represented to include reasonable data security protections;

h) Diminution in the value of their Private Information;

i) Anxiety, emotional distress, and mental anguish arising from the knowledge that their sensitive medical and personal information has been exfiltrated by an unauthorized actor and may be used against them at any time; and

j) The continuing risk to their Private Information, which remains in QualDerm's possession and may be subject to further breaches absent adequate remedial measures.

52. Defendant's conduct, as described herein, has caused real, immediate, and continuing harm to Plaintiff and Class Members. Even for those individuals who have not yet experienced actual identity theft or fraud, the confirmed exfiltration of their Private Information to a criminal actor establishes a concrete and imminent injury that is not speculative. Where, as here, data has been actually obtained by an unauthorized third party, affected individuals are injured by the sufficiently imminent risk of future harm alone.

53. Identity theft and the compromise of sensitive medical information exact a severe emotional toll on victims. According to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, among victims of identity crimes: 84% reported anxiety; 76% felt violated; 32% experienced financial-related identity problems; 83% reported being turned down for credit or loans; 32% reported problems with family members as a result of the breach; and 10% reported feeling suicidal. Victims also reported physical symptoms: 48% experienced sleep disturbances; 37% reported an inability to concentrate or focus; 29% were unable to go to work because of physical symptoms; 23% reported new physical illnesses; and 13% reported a start or relapse into

unhealthy or addictive behaviors.[6]

54. According to a Presidential Report on identity theft, individual victims often suffer indirect financial costs, including costs incurred in civil litigation initiated by creditors and in overcoming obstacles to obtaining or retaining credit. Victims of non-financial identity theft, including health-related fraud, face distinct harms and frustrations. The United States Department of Justice's Bureau of Justice Statistics has found that identity theft victims reported spending an average of seven hours resolving issues related to identity theft or fraud.[7]

55. Data security is a primary concern for consumers. According to a survey conducted by cybersecurity firm FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important factor in purchasing decisions, and nearly the same percentage would pay more to work with a provider that maintains better data security. Seventy percent of consumers would provide less personal information to organizations that have suffered a data breach. These findings underscore the concrete economic value that Plaintiff and Class Members placed on the implicit promise that QualDerm would safeguard their Private Information.[8]

56. Plaintiff and Class Members further seek to recover the value of the unauthorized access to their Private Information caused by QualDerm's wrongful conduct. This measure of damages is analogous to remedies for the unauthorized use of intellectual property. Like

---

[6] *See* Identity Theft Resource Center, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, Their Families, Friends, and Workplaces* (May 2021), *available at* https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited Feb. 27, 2026).

[7] *See* Erika Harrell, *Victims of Identity Theft, 2014*, Bureau of Justice Statistics, U.S. Department of Justice (Sept. 2015), *available at* https://bjs.ojp.gov/library/publications/victims-identity-theft-2014 (last visited Feb. 27, 2026).

[8] *See* FireEye, Inc., *Beyond the Bottom Line: The Real Cost of Data Breaches* (2016), *available at* https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited Feb. 27, 2026).

technology protected by a trade secret, a person's Private Information is non-rivalrous — the unauthorized use by a third party does not diminish the owner's own ability to use such information, yet the owner may recover the reasonable value of its use, i.e., a "reasonable royalty," from the unauthorized user. A similar royalty or license measure of damages is appropriate here because: (a) Plaintiff and Class Members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, including evidence regarding the price at which similar data is transacted on both legitimate and illegitimate markets.

## CLASS ACTION ALLEGATIONS

57. Plaintiff brings this action on behalf of Plaintiff and the following class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

> All individuals residing in the United States whose Private Information was compromised as a result of the unauthorized access to Defendant's systems.

58. Excluded from the Class are: (a) QualDerm, any entity in which QualDerm has a controlling interest, and its officers, directors, legal representatives, successors, subsidiaries, and assigns; (b) any judge to whom this action is assigned, together with any members of that judge's staff and immediate family; (c) any person who files a timely and proper request for exclusion from the Class; and (d) all persons who have previously released claims encompassed by this action.

59. **Numerosity:** The members of the proposed Class are so numerous that joinder of all members is impracticable. According to QualDerm's report to the Texas Attorney General, the Data Breach affected 174,837 Texas residents. The nationwide total is believed to be several million individuals. The precise number and identities of Class Members can be ascertained from

QualDerm's records and from the notifications sent by QualDerm.

60. **Commonality:** There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members. Common questions include, but are not limited to: (a) whether QualDerm owed a duty to Plaintiff and Class Members to adequately protect their Private Information; (b) whether QualDerm breached that duty by failing to implement reasonable data security measures; (c) whether QualDerm's data security practices violated applicable laws, regulations, and industry standards, including the HIPAA Security Rule and HITECH Act; (d) whether QualDerm's conduct constituted gross negligence; (e) whether QualDerm's conduct constituted a breach of its implied contract with Plaintiff and Class Members; (f) whether QualDerm was unjustly enriched; (g) whether the Data Breach resulted from QualDerm's failure to implement reasonable security measures; (h) whether Plaintiff and Class Members suffered legally cognizable damages; and (i) the appropriate measure of damages and other relief.

61. **Typicality:** Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and all Class Members had their Private Information compromised as a result of the same Data Breach caused by QualDerm's uniform failure to implement adequate data security measures. Plaintiff and all Class Members were harmed by QualDerm's same course of conduct, and the relief sought is common to the Class.

62. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's interests do not conflict with the interests of the Class Members, and Plaintiff has retained counsel experienced in class action litigation, including data breach class actions. Plaintiff and Plaintiff's counsel are committed to prosecuting this action vigorously on behalf of the Class.

63. **Predominance and Superiority:** Common questions of law and fact predominate over any questions affecting only individual Class Members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, among other things: (a) the expense and burden of individual litigation would make it impracticable for Class Members to seek individual redress for the wrongful conduct alleged herein; (b) the interests of judicial economy will be served by resolving the common issues of law and fact in a single action; (c) individual Class Members are unlikely to have an interest in individually controlling the prosecution of separate actions; and (d) the difficulties likely to be encountered in the management of this class action are outweighed by the benefits of proceeding on a class-wide basis.

64. **Injunctive and Declaratory Relief Class:** QualDerm has acted and refused to act on grounds that apply generally to the Class, so that final injunctive relief and corresponding declaratory relief are appropriate with respect to the Class as a whole. Specifically, QualDerm continues to maintain Plaintiff's and Class Members' Private Information in its systems, and absent injunctive relief, Plaintiff and Class Members remain at risk of further unauthorized access.

## CAUSES OF ACTION

### COUNT I
### GROSS NEGLIGENCE
### (On Behalf of Plaintiff and the Nationwide Class)

65. Plaintiff realleges and incorporates by reference paragraphs 1-64 above as if fully set forth herein.

66. QualDerm owed a duty of care to Plaintiff and Class Members to exercise reasonable care in collecting, storing, using, and safeguarding their Private Information. This duty arises from multiple sources, including: (a) QualDerm's special relationship with its patients, who entrusted QualDerm with their sensitive Private Information as a condition of receiving healthcare

services; (b) QualDerm's role as a custodian of Private Information, which imposed upon it a duty to implement reasonable security measures commensurate with the sensitivity of the data; (c) applicable federal and state statutes and regulations, including HIPAA and HITECH, which, though they do not create a private right of action, establish the standard of care applicable to entities in QualDerm's position; (d) industry standards for data security in the healthcare sector; (e) Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data; and (f) the principle that any social utility of QualDerm's conduct in failing to adequately protect Private Information is far outweighed by the magnitude and severity of the injuries suffered by Plaintiff and Class Members as a result of the Data Breach.

67. While Plaintiff does not assert a private right of action under HIPAA or HITECH, QualDerm's obligations under those statutes and regulations—including the HIPAA Privacy Rule (45 C.F.R. Part 164, Subpart E), the HIPAA Security Rule (45 C.F.R. Part 164, Subpart C), and the HITECH Act (42 U.S.C. §§ 17921–17954)—inform and establish the applicable standard of care for QualDerm's handling of PHI. QualDerm's failure to comply with these standards constitutes evidence of gross negligence.

68. Defendant's conduct went far beyond ordinary negligence. Defendant acted with gross negligence by consciously and recklessly disregarding known risks to Plaintiff's Private Information, including by(a) failing to implement and maintain reasonable and adequate data security measures to protect Private Information from unauthorized access; (b) failing to comply with the HIPAA Security Rule's requirements for administrative, physical, and technical safeguards; (c) failing to conduct adequate risk assessments and address known or foreseeable

vulnerabilities; (d) failing to implement reasonable access controls, including multi-factor authentication; (e) failing to adequately monitor its systems for unauthorized access; (f) failing to adequately secure PHI; (g) failing to maintain adequate intrusion detection and response capabilities; and (h) failing to provide timely notice to affected individuals.

69. QualDerm's duty to safeguard Plaintiff's and Class Members' Private Information is independent of any contractual duty. Healthcare providers that collect and maintain sensitive medical and personal information owe an independent duty of care to protect that information from foreseeable harm, regardless of whether there is a direct contractual relationship between the parties on the specific issue of data security. This independent duty is sufficient to overcome any economic loss rule defense.

70. The Data Breach was a reasonably foreseeable consequence of QualDerm's failure to implement adequate security measures. Cyberattacks targeting healthcare organizations are well-documented and widely reported, and QualDerm knew or should have known that its systems were at risk of unauthorized access.

71. But for QualDerm's breach of its duty of care, the Data Breach would not have occurred, and Plaintiff's and Class Members' Private Information would not have been exfiltrated by an unauthorized actor.

72. As a direct and proximate result of QualDerm's gross negligence, Plaintiff and Class Members have suffered damages as described herein, including but not limited to the actual and imminent harms arising from the exfiltration of their Private Information, the costs and burdens of mitigation, loss of privacy, overpayment for services, and emotional distress.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class)**

73. Plaintiff realleges and incorporates by reference paragraphs 1-64 above as if fully set forth herein.

74. When Plaintiff and Class Members provided their Private Information to QualDerm as a condition of receiving healthcare services, an implied contract was formed between QualDerm and each patient. The terms of this implied contract included QualDerm's obligation to implement and maintain reasonable data security measures to protect the Private Information it collected and stored, and to use such information only for purposes authorized by the patient or required by law. The implied contract included, among other things, the following implied promises: (a) taking steps to ensure that anyone granted access to Private Information also protects the confidentiality of that data; (b) restricting Private Information access only to employees and agents who are qualified and trained; (c) designing and implementing appropriate retention policies to protect Private Information; (d) applying proper encryption and/or the separation of different data sets containing Private Information; (e) implementing multi-factor authentication for access to Private Information; (f) taking steps to ensure that Private Information placed in control of QualDerm's employees or agents is restricted and limited to authorized business purposes; and (g) taking other reasonable steps to protect against foreseeable breaches.

75. Plaintiff and Class Members provided valuable consideration in the form of their Private Information and payment for healthcare services, with the reasonable understanding and expectation that QualDerm would safeguard their Private Information in accordance with applicable law and industry standards. Plaintiff and Class Members would not have provided their Private Information to QualDerm, or would have insisted on additional protections, had they

known that QualDerm would fail to implement reasonable security measures.

76. QualDerm breached the implied contract by failing to implement and maintain reasonable data security practices, which directly resulted in the unauthorized access and exfiltration of Plaintiff's and Class Members' Private Information.

77. As a direct and proximate result of QualDerm's breach of the implied contract, Plaintiff and Class Members have suffered damages as described herein, including but not limited to the loss of the benefit of the bargain, overpayment for services, and the costs of mitigating the effects of the Data Breach.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class)**

78. Plaintiff realleges and incorporates by reference paragraphs 1-64 above as if fully set forth herein.

79. Plaintiff and Class Members conferred a benefit on QualDerm in the form of their Private Information, which has direct and substantial economic value, and in the form of payment for healthcare services that were implicitly represented to include adequate data security protections.

80. QualDerm received and retained the benefit of Plaintiff's and Class Members' Private Information and payments for healthcare services. QualDerm used Plaintiff's and Class Members' Private Information for its own business purposes, including to operate and grow its network of affiliated practices, to obtain insurance reimbursements, and to otherwise profit from the provision of healthcare services.

81. It would be inequitable and unconscionable for QualDerm to retain the benefit of Plaintiff's and Class Members' Private Information and payments without providing adequate data

security protections. QualDerm saved money by not investing in adequate data security measures, and those savings came at the direct expense of Plaintiff and Class Members, whose Private Information was left vulnerable to and ultimately compromised by unauthorized access and exfiltration. In particular, QualDerm enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, QualDerm calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, less effective security measures. The payments QualDerm received in its ordinary course of business included an implicit premium for data security obligations that were supposed to be used, in part, to pay for the administrative and technical costs of providing reasonable data security and protection for patients' Private Information.

82. Plaintiff and Class Members are entitled to restitution and disgorgement of the profits and benefits QualDerm obtained through its retention and use of their Private Information without providing adequate security, in an amount to be determined at trial.

**COUNT IV**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiff and the Nationwide Class)**

83. Plaintiff realleges and incorporates by reference paragraphs 1-64 above as if fully set forth herein.

84. An actual controversy exists between the parties regarding QualDerm’s obligations to adequately secure Plaintiff’s and Class Members’ Private Information, which remains in QualDerm’s possession and under its control, and regarding QualDerm’s obligations to take reasonable measures to prevent future breaches.

85. Plaintiff and Class Members face a continuing threat of injury from QualDerm’s

inadequate data security practices. QualDerm continues to collect, store, and maintain the Private Information of hundreds of thousands, if not millions, of patients, and absent injunctive relief, there is an ongoing risk of further unauthorized access to that information.

86. Plaintiff, on behalf of the Nationwide Class, seeks the following declaratory and injunctive relief:

a) A declaration that QualDerm's data security practices, as alleged herein, were and are inadequate and failed to comply with applicable laws, regulations, and industry standards;

b) An order requiring QualDerm to implement and maintain reasonable data security measures, including but not limited to: (i) encryption of all PHI and PII at rest and in transit; (ii) implementation of multi-factor authentication for all systems containing Private Information; (iii) regular, independent third-party security audits and penetration testing; (iv) implementation of adequate intrusion detection and prevention systems; (v) comprehensive employee cybersecurity training; (vi) a reasonable data retention and destruction policy; and (vii) other measures as may be required by applicable law and industry standards;

c) An order requiring QualDerm to preserve all documents and forensic evidence related to the Data Breach;

d) An order requiring QualDerm to provide adequate credit monitoring and identity theft protection services to Plaintiff and Class Members for a period commensurate with the severity and duration of the risk created by the Data Breach;

e) An order requiring QualDerm to submit to future audits of its data security practices by qualified independent third-party assessors; and

f) Such other and further injunctive and declaratory relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Nationwide Class, respectfully requests that this Court enter judgment against Defendant QualDerm Partners, LLC, and award the following relief:

A. An order certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Compensatory damages in an amount to be proven at trial;

C. Statutory damages, to the extent permitted by applicable law, including nominal damages;

D. Restitution and disgorgement of all profits and unjust enrichment obtained by Defendant as a result of its unlawful conduct;

E. Declaratory relief as described herein;

F. Injunctive relief as described herein, including an order requiring Defendant to implement and maintain adequate data security practices and to provide credit monitoring and identity theft protection services;

G. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

H. Reasonable attorneys' fees and costs of suit, including expert fees; and

I. Such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: February 27, 2026

*<u>/s/ Grayson Wells</u>*
J. Gerard Stranch, IV (TN BPR 23045)
Grayson Wells (TN BPR 039658)
Sam Douthit (TN BPR 43065)
**STRANCH, JENNINGS, & GARVEY, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
Fax: (615) 255-5419
gstranch@stranchlaw.com
gwells@stranchlaw.com
sdouthit@stranchlaw.com

Jonathan S. Mann (*pro hac vice forthcoming)*
**PITTMAN, DUTTON, HELLUMS,**
**BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
jonm@pittmandutton.com

*Attorneys for Plaintiff and the Putative Class*